Please be seated. Thank you. Clerk, please call the next case. 112-549, State of Illinois Attorney here, v. Charles English. Counsel? Proceed. Good afternoon, Your Honors. Counsel, may it please the Court. My name is Mary Labreck. I'm an Assistant Attorney General here representing the Illinois State Treasurer as Ex Officio Custodian of the Injured Workers' Benefit Fund. This Court should reverse the Circuit Court's judgment and reverse the final administrative decision of the Commission. This case is about the rule that the claimant bears the burden, by a preponderance of the evidence, of showing that she has sustained accidental injuries, one, arising out of, and two, in the course of her employment. The claimant satisfied her burden with respect to the second part, the in-the-course-of requirement, but she did not satisfy the arising-out-of requirement. We are here today because if she proved that her injury arose out of her employment, it is hard to see how anyone could fail to do so, and also because we believe that the Commission's decision has effectively written the arising-out-of language out of the test. The Illinois Supreme Court has held that the arising-out-of part of the test is about causation, whether the employee can show that she was exposed to some risk of injury to a greater degree than she would have been if she had not been employed. Here we have a minimal record with respect to this issue. The relevant facts are the claimant fell down and broke her wrist while going to get the mail for her employer. She went to change her shoes, preparatory to going downstairs, and she fell. That's all there is. There is no evidence that she was exposed to a greater risk than our members of the general public. Therefore, the Workers' Compensation Commission could not have properly determined that she satisfied the arising-out-of requirement. Turning to unpack the legal standards a little, the purpose of the test is to make industry internalize its own costs by paying for the injuries it causes. There are two requirements, both of which must be satisfied. The in-the-course-of requirement establishes a nexus with the employment. It has to do with the time and the place and the circumstances. That is, the injury must occur during work hours at the workplace or someplace that the work takes the employee, and it must occur while the employee is acting in furtherance of her employer's goals. That element is not disputed here, is it? The in-the-course-of, that's right. The arising-out-of requirement, in contrast, has to do with whether something about the work contributes to a risk of injury greater than is faced by the general public. The appellate case law has divided the potential risks into three categories, but all three get at, in some way, whether there was a greater risk. Two indicate where such a risk exists, and one indicates where it does not. What about the argument, again, and this comes to mind, they could argue that this was beyond the general risk because of the situation with the medication and the concern, the man that eventually died basically told her to go get the mail or answer the door, so she's in a hurry to perform her work-related task per the employer's orders. Does that factor into this? Well, Your Honor, there's no evidence that she was going to get medication. There was no evidence that medication was urgently needed, first of all, and there was no evidence that medication was what was in the mail. Well, but the doorbell rang, correct? It did, and she suggested that it might have been either medication or audio tapes because those were the two things he got most frequently. So if that's in her mind, though, does she have to establish that it actually was medication? No, she had to establish, though, that there had to be a real reason for her to hurry. Even if it had been medication, there was no reason to think that he needed it right then. We don't know how often he received his installments of medication. Well, let's say he ordered her to go to the door immediately. What do you make of that? Couldn't he do that? He could, but there's no evidence he did that. And I suppose, Your Honor, it's just in that he did the equivalent of ordering her to rush. I suppose that could factor in, but that's not the situation we have here. If that did happen, that's not in the evidence. I have trouble with the arbitrator's decision in this case only because it absolutely misrepresents what happened to this lady. This decision, the Petitioner testified that on May 10th at 2 o'clock the doorbell rang. As she was going downstairs to pick up a package that was being delivered for Mr. Moose, she slipped and fell down, breaking both of her wrists. That is not what happened to this lady. What happened to this lady is she testified that she heard the doorbell, she went to Moose to inform him that she was going downstairs to pick up the delivery, and then because she was wearing house slippers, as she normally did, she attempted to change into her regular shoes. When she tried to put her regular shoes on, she fell. She did not fall down the stairs as she was going to get something at the door. I mean, this is just a totally inaccurate representation of what happened to this woman. So now the question becomes, is falling down when you're changing from your house slippers to your shoes an event to which the general public is not exposed? We don't think so, Your Honor. And the fact is it doesn't really matter exactly how she fell in this case, because both changing one's shoes and going down the stairs are normally fairly safe activities. Well, going down the stairs if you're forced to go up and down a lot, that's a little  But there's no evidence of that, Your Honor. But changing the shoes, that's certainly something. But changing your shoes is not particularly dangerous. Well, was she required to change from her shoes into her house slippers when she entered Mr. Moose, when she entered his premises to start her work? That's correct, Your Honor. But the evidence doesn't even show that. It does not show that. She says that she normally did that. In other words, if she's going down those stairs to be sanitary, she was not necessarily required to take off the house slippers, put on the shoes, and then when she got back, take off the shoes, put on the house slippers. That's right. We have no specific evidence of that. Could that be an inference, a reasonable inference that could have been drawn? Well, Your Honor, in order to draw inferences, the commission must draw probable inferences. It's not enough if it's merely possible. As in the first cash case where there was an issue about the bathroom tiles. So an inference has to be probable, not just possible? Yes, in order to draw. Well, then how do you have competing inferences, if that's the case? Not necessarily in this particular fact pattern, but aren't there competing inferences that can be drawn from facts? That usually happens, I think, when you have a credibility issue. And then when you, depending on which side you take the credibility, different inferences can be drawn. But this case, we have, it's possible. Okay, so I just want to make sure I understand. Inferences are drawn from probable facts, but not from possible facts. No, the conclusion to be drawn must exist within the realm of probability and not merely within the realm of possibility.  But if it only exists within the realm of possibility, it's nothing but guess, speculation, or conjecture, and you can't rely on it. It's here. I mean, it's possible that she had to change her shoes on what we know, but it's also possible that she did it for her own comfort. I mean, people do both of those things for many reasons. Would it be any reasonable inference that because the doorbell rang, she wanted to get to the door before whoever was ringing the doorbell left, and because she knew that it could be medication, that she rushed in changing her shoes, and changing her shoes was necessary, or from her slippers into her shoes was necessary, in order for her to answer the door, thus falling within... Well, Your Honor, we believe that that's possible, because that's only one of a range of things that could have happened. She knew a delivery was coming, but she evidently wasn't expecting anything in particular, because she didn't know what it was. If she had been missing something, and waiting for it, that would be another matter. But there was no evidence of that. There was no evidence that she had had any difficulty getting to the door in time to fetch the mail before. There's no evidence for that matter that they didn't regularly leave the packages if she didn't get to the door in time. There just isn't any evidence on which we can depend to say that any of those potential things happened here. But you wouldn't expect prescription medication to be left outside, would you? I mean, is that what you're suggesting, that the prescription may have been just left out by the door? Well, I wasn't suggesting particularly that prescription medicine could be, but audiotapes might be, other kinds of mail might be. But she does not know. I mean, he has a good point. I mean, if it's prescription medication, and he needs it, you can't take a chance on it being left outside. And probably they're not going to just leave it on the doorstep. So doesn't that bear any interest? Okay. That was an example that maybe was not the best example. She didn't say that she was worried about getting there in time. She didn't say the person wouldn't wait for her. This is something that she had done before. The mailman may have known that someone was there all the time because of her condition. She suggests that we should infer from the fact that she went to Mr. Mews first, and then she had to change her shoes, that she was running out of time. But we might as easily infer to that that she knew that she had plenty of time to do it, because she could have yelled over her shoulder to him that she was going to fetch the mail. So you're saying this is part of the normal routine activity she did every day. So therefore, you're saying there's nothing that takes it out of it, arising out of it, because she does this all the time. And it's nothing – there's nothing that suggests that there's any urgency about it. She didn't – she – that she had to rush. There's no – I mean, she didn't say she was rushing. There's no evidence that she had any reason to rush, either because, as you say, she was waiting for medication. She was – you know, she thought it might be a prescription medication, and they couldn't get for it. There's just nothing to suggest that she was in any way hurried. And so even if she had – even if she had to change her shoes, then there still would not be a greater risk of having to change the shoes. The whole – her entire case depends on the rushing, because changing shoes is a safe activity, and going downstairs is a safe activity normally. And the only reason why the combination would be in any way dangerous is if there was some reason to rush. And there just is nothing to show. There's only the possibility. We can theorize other possibilities that might have led her to rush, but we don't have any evidence to take that out of the possible to the probable. And the frequency of her trips. She also suggests that the trips were so frequent. Well, we don't – we don't even have evidence that it was daily, although the commission did assume that it was. But there's no reason to assume that delivery of medication would be daily, that he couldn't receive it in increments that would last him longer than that, or the same with audio tapes. And even if it was daily, that would not be enough, because the claimant had to cross a non-defective curb regularly, and the court said that that was not sufficient to take it outside of the – How do you distinguish this from the William G. C. E. A. S. case? Affirming the commission's finding that the claimant's decedent's accident arose out of her employment because she fell while rushing downstairs to deliver a Federal Express envelope at her boss's direction. Well, Your Honor, in that case, we had affirmative evidence of rushing. We had testimony of employees who said that they saw her rushing, and they – and she had two sources of urgency in that case. She had – her boss asked her to do something at the last minute. That made her upset. Two sources, actually. She was asked to do something at the last minute. She was upset because her boss had repeatedly done this before, and she was trying to make the FedEx deadline. That makes this entirely different. Three types of evidence that we don't have. Okay. Thank you, counsel. We have time on reply. Thank you. Counsel.  My name is Matt Belcher, and I represent Yanina Zakrzewska. May it please the Court. Counsel, Ms. Lebrecht. I'd like to commend Ms. Lebrecht on her handling of this case. I think she's the fourth or fifth assistant attorney general in the case, and I think that she's put the most time and effort into it. And I'd also like to acknowledge and set forth immediately on the record that perhaps sort of the shortcoming of the case has to do with my failure to elicit sufficient information in the record. But I can assure you that this case was not heard in a vacuum. This case was heard over the course of two years. So now I know two things. You've complimented opposing counsel and you've fallen on your sword. Perhaps. But in both instances, it's warranted. But may I just, in my own defense, just set forth that I'm not the only one who thought that this case was defensible, besides the arbitrator and the commissioner. On page 8 of Ms. Lebrecht's brief, she sets forth that I had filed a motion to dismiss, and the basis for that motion to dismiss was after you finish a trial at the Workers' Compensation Commission, you give the judge your draft order about a proposed decision. And the assistant attorney general's draft order, proposed decision, was what the arbitrator asked. All right. So notwithstanding what you said, I mean, obviously you'd have to agree we're sort of stuck with the record. Yes. It's not clear as to what the decedent said to the claimant here, et cetera, et cetera. So her argument, I think, distilled down to its finest terms is, you know, what happened here? She does this on a daily basis. She's a housekeeper. She helps him. She goes up and down stairs all the time as part of her normal routine daily activities. She falls on one of these trips. Why is this compensable? Judge, if I may, just a little bit of background. What actually happened, and she did fall down the stairs, is that she wears her house shoes, and we assert that the reason she wears house shoes is for sanitary conditions. She's a caretaker. It doesn't benefit her to wear house shoes inside the house. It benefits the employer, Mr. Mews. However, to go outside to maintain the hygiene or sanitary of her shoes, she needs to leave the physical exterior of his house, go down a flight of stairs. This is an apartment building. Which she does every day. She does. So what happened on this occasion? It takes it out of the normal routine activities. And she demonstrated this at the trial, and I admit that it's not set forth clearly enough in the record. But at the trial, she demonstrates she's on the stairs. She's changing her shoes on the stairs, falls down the stairs, breaks both of her wrists, and knocks herself unconscious. Well, could you tell me how changing your shoes from slippers exposes you to a risk greater than the risk to which the general public is exposed every time they change their shoes? Well, Justice Hoffman, may I suggest that perhaps we don't get to that test? Because the first part of the test is if that's the only get to that if the travailing of the stairs is not incidental to her employment. So the first part of the test is... Wait a minute. Whoa, whoa. Wait a minute. Hold on a second. Yes, Justice. She picked whether she was going to change her shoes. Yes, Justice. So you tell me how changing your shoes exposes you to a risk greater than the general public is exposed to. I'll answer. I promise I'll answer the question. But let me just say that I think the first test is whether or not the travailing of the stairs is incidental to her employment. If the commission finds it was incidental to her employment, we don't get to that analysis. However, we don't know from the decision, but assuming they don't get to the incidental to her employment test, we then begin the second part of the inquiry, which is was she exposed to a risk greater than... Well, what's the risk? What's the risk? Well, the risk is she's standing on the stairs in the fall in the same way that the fall in Nabisco is that the cause of the injury is holding her, holding the knives. The proximity of her body on the staircase when she's changing her shoes and falling down the flight of stairs, because she has to go get the whatever's, who's ever ringing the doorbell, puts her at a risk greater than that of the general public. Where she was going to change her shoes? She has to leave her outside shoes outside. Who says? Does she testify to that? No, she does not. Who says? Well, it's a... This would be a great, great rationale, but where in the record is the evidence that she, one, has to wear slippers that are inside the house because of hygienic germ reasons, and then she has to put on street shoes outside of the apartment so that she doesn't contaminate her slippers when she comes back in? I mean, where's all of that meaning? I appreciate what you're saying, Justice Holder. And I wish that the Workers' Compensation Commission met in this building and we had time and energy to sit and discuss the micro-exegesis of these various aspects of the law. But it is literally, you know, Upton Sinclair's sausage factory sometimes, and I have a half hour, 45 minutes to produce the entire... Coming down from Upton Sinclair's sausage factory, the point is, is that we can't fill in the gaps in the evidence, can we? We can to a certain extent if we have a permissible inference, which I first assert is that the commission found that travailing the stairs was incidental to her employment. If it's incidental to her employment, we don't necessarily need to get to the general public. Travailing the stairs didn't cause her injury. But if it's incidental to her employment... But so what? She didn't fall down the stairs because she was walking down the stairs. She was changing her slippers somewhere evidently at the top of the stairs and fell down. She was changing her slippers. She was not walking up and down the stairs. That's not what she testified to. I appreciate that. But if further explanation as to what the basis of the commission's decision was should have been addressed in a 19E petition at the time of the commission's decision. It was also, this argument was never made to the commission, nor was this evidence... Whose obligation was it to introduce all of the evidence necessary to establish that her injury was incurred in the course of her employment? Let the record reflect that I take responsibility. Is there, is it in the record? There's sufficient evidence in the record that would cause the assistant attorney general to prepare a draft order indicating that the accident arose out of her in the course of her employment. The circuit court found that that was insufficient. So the assistant attorney general who participated... This is another one of your stipulation cases, is it? No, it's not. Maybe tomorrow. Are we going to get back to Upton Sinclair? If I'm understanding correctly, is that at the end of the hearing before the arbitrator, all the proofs are in, your draft respectively proposed orders, dispositions with findings, right? Yes, Justice. And you're telling me that the defense prepares an order saying that it arose out of and in the course of the injuries of the claimant, arose out of and in the course of her employment? Yes, Justice. And the arbitrator didn't tell them to prepare that? No. Each site is provided with an opportunity generally within 14 days to prepare a draft order, which we call proposed decisions. And so what did your order say? Larger. Same findings, larger injury, because this isn't a 19B, this isn't a 19B1. This is with the injured workers benefit fund is a remedial aspect of the remedial act of the workers compensation plan. It's a stopgap that's designed to provide benefits for the pernicious effect of uninsured employers. All that is payment issues. So we're talking about whether or not the arbitrator is, this is a compensable claim. Yes, Justice. And two weeks later, a proposed decision was tendered to the arbitrator by the attorney general's office that indicated that the accident arose out of and in the course of employment. And what did the arbitrator do? He entered an order that the accident arose out of and in the course of employment. What did the step sheet say? Did the employer dispute? The attorney general's office asserts that it's their duty to not necessarily deny, because deny requires you to at least do some sort of investigation and due diligence, but they dispute every issue. So they won't even acknowledge that the lady's female, married, has children or what her date of birth is. They assert that they have the obligation to dispute everything. Okay. Well, then maybe perhaps I'm missing something. But what does the drafting of a proposed order from the standpoint of either side have to do with the decision in the case? Can the attorney general or can you just make the decision for the arbitrator? Is that what you're suggesting here? Who does that bind? No, I'm just suggesting that at the conclusion of the trial, it was the attorney general's position that I had proved arising out of and in the course of, and perhaps we're looking at the snapshot vacuum of this transcript as opposed to the two years that the case appeared. What does that have to do with the evidence in this case is my question. What does the proposed order have to do with the evidentiary findings in this case? During the two years, the two-year course of this trial, a two-year course of the litigation of this claim, I don't think that anyone ever disputed that this lady. What if that's true? Don't we have an independent basis obligation to impartially review the evidence, or do we just say, well, nobody's reviewed it in two years. That's the ballgame. Well, Justice Hudson, I agree with you that you have a responsibility. But I think that the record and the arbitrator's decision and the commission's decision provide you with sufficient information so as to affirm the commission's decision. Counsel, have you taken a look at what the Supreme Court said in Branch v. the commission or in Greater Peoria Mass Transit District v. the commission? I don't think they're in the briefs. Are you familiar with either one of those cases? I'm sorry, I'm not. Well, one of them involves the claimant taking off his coat upon arrival at work. And there the claim was made, and it was denied by the Supreme Court. And that was indeed the Branch case. And then Greater Peoria Mass, which is cited in the Branch case, was a case where the petitioner suffered a dislocation of her shoulder when she bent over to pick up transfer schedules that she had dropped and she lost her balance. Now, we've got two Supreme Court cases, one where somebody's taken off their coat, one where they're bending down to pick up something that they have dropped. And both of those cases the Supreme Court found against the claimant. They sound very close to me, factually, to what we have here, somebody changing their shoes. Any comment? And if you haven't read them, I'm sure it would be kind of difficult. Well, I acknowledge what you've said, but I think that the peculiarity of this situation involving this caregiver who provides for a blind man that receives medications who died during the pendency of the litigation, she's going to go pick up a package, someone's ringing the doorbell. She knows that it's either medications or tapes. It's my position that she's wearing house shoes as, I don't know, perhaps not coming from Chicago, there's a lot of Eastern European cleaning ladies and they leave their shoes outside and wear house shoes so as to protect the hygiene or the sanitary nature of the inside of the house. So she's standing outside the stairs, she's putting on her shoes, and the commission could have found that such activity was incidental to her employment. And once it's incidental to her employment, she falls down the flight of stairs because of the peculiarity of where she's required to change her shoes and then falls and breaks both of her wrists and knocks herself to the floor. The problem is you threw in a verb called required. Is there anything in this evidence, in the record, that would show that she was required to change her shoes and that she was required to change them at the landing, at the top of the stairs? I think that that is a permissible inference from the commission's decision. Okay. Thank you, counsel. Thank you. Counsel may reply. Are you familiar with the proposed order that was submitted by CTA? Your Honor, I don't know exactly how that proposed order came to be filed. But I do know that the AAG never intended that to be a concession of the, or admission of this issue. And the arbitrator never thought that we meant it to be a concession of the issue. How can we say the arbitrator never? Didn't the arbitrator just basically enter what you proposed? Well, it did. It was not in the narrative. The box was checked to say arising out of. And I, as I say, I don't know how that happened. But the arbitrator never actually thought that we conceded the issue. And we don't know that. But, again, we're back to another inference, right? All right. This case is rife with inferences. Is it a reasonable inference? Okay. That was not. That was not something that was. Well. After hearing the proofs of opposing counsel, you were just overwhelmingly convinced that you thought you had a proposed order? It is not my understanding from speaking to counsel that at any time they were ever convinced. Subsequent to that, we argued before the commission that that was not the case. And the issue was left alone there. And it has not been argued on appeal until now that the basis for this Court's decision should be that proposed order that we made. So basically these forfeited the argument, right? Yes. They forfeited the argument. And that's more than a reasonable inference. Yes. And, Your Honor, you also, I wanted to point out that there is, that she now claims and she claimed before that there was a need to have a sanitary environment. And there is no evidence of that in the record. She never said in her testimony the idea that there was a need for a sanitary, particularly sanitary environment comes only from counsel. And now you suggested also that it was a custom among women of these sorts, which cancels out his earlier suggestion that it was a need for sanitary reasons. Would you be here if that evidence was present in the record? If there was evidence showing that there was a greater risk of injury, no, Your Honor, we would not be here. Her argument that it was somehow incidental is, I understand this, this is, she's talking about the distinctly associated part of the test where she claims that for some reason it's distinctly, her activity is distinctly associated with her employment just because it was part of her duties. But that fails to give any scope to the risk requirement. Because just because a task is part of an employer's duties does not mean that it will be any particularly greater risk than anyone else. Well, unless it's required to be performed in an area of greater risk, right? That's a possibility, but there's no evidence of it having to be performed in an area of greater risk. And under 19E, we didn't ask for a specific finding because it wasn't necessary, because there was no facts to support the commission's decision. We thought it was likely that the commission made an error of law rather than one of fact, because it is more likely that they made that evidence, that that error, particularly since counsel argued it, than that it made a mistake on the facts. But either way, counsel's decision was mistaken. Your Honor, in sum, she fails to satisfy her burden of pointing to facts showing a risk of injury greater than that based by the general public. The facts she points to have nothing to do with risks, and the risks she alludes to have no basis in the facts. Although the manifest weight standard is a very differential standard where the commission's decision is not supported by evidence of record, it is the duty of this court to set the commission's decision aside. It's hard to imagine any case that satisfies even the rise out of requirement less, both because of the low risk of moving about a home environment unencumbered and because of the lack of any evidentiary detail. And the effect of the commission's decision is to nullify the rising out of requirement by eliminating the need to prove a greater risk. For all the reasons brought forward in this argument in our briefs, we urge this court to uphold the vitality of the rising out of requirement and reverse the circuit court's decision affirming the commission's award of benefits. Thank you, counsel. Thank you. This matter will be taken under revised.